FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 MAR 29  PM 2: 53

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| J. RAY McDERMOTT ENGINEERING, L.L.C., SPARTEC, INC. AND J. RAY McDERMOTT, INC. | CIVIL ACTION |
| VERSUS | NO. 04-1335 |
| FUGRO-McCLELLAND MARINE GEOSCIENCES, INC. | SECTION "C" |

### ORDER AND REASONS

Before the Court is defendant Fugro-McClelland Marine Geosciences, Inc.'s ("FMMG") Motion for Summary Judgment on Claims of J.Ray McDermott, Inc. ("JRM").[1] The motion calls for the Court to wade into the murky jurisprudential swamp created by the uneasy relationship between the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331-1356 ("OCSLA" or "the Act") and federal admiralty jurisdiction. FMMG contends that this case arises under the Court's admiralty jurisdiction and, accordingly, that federal maritime law governs the tort claims at issue here. JRM

---

[1] This motion is Rec. Doc. 85.

1

responds that jurisdiction is predicated solely on OSCLA and that Louisiana law applies as surrogate federal law, as required by the Act[2]. At stake is whether or not the principles articulated by the Supreme Court in <u>Robins Drydock & Repair Co. v. Flint</u>, 275 U.S. 303 (1927), an admiralty case, apply here. Additionally, independent of the choice-of-law question, FMMG asserts that JRM's contract claims should be dismissed because it claims that JRM is not a third-party beneficiary to the contract between FMMG and plaintiff J. Ray McDermott Engineering, LLC ("JRME"). With regard to the tort claims, the Court finds that Louisiana law applies and the motion for summary judgment is **DENIED** as to those claims. However, the Court is persuaded that JRM has failed as a matter of law to establish that it was intended to be a third-party beneficiary to the contract between FMMG and JRME and summary judgment is **GRANTED** in regard to JRM's contract claims against FMMG.

I. Factual Background

This case concerns problems which arose during the construction of an oil and gas platform, known as the Devil's Tower SPAR Platform, which was to be permanently installed into the seabed on the outer Continental Shelf ("OCS"). (Rec. Doc. 1). The facility was to be "used for the exploration, development and/or production of minerals of

---

[2] OCSLA provides:

> To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws . . . the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf . . . .

43 U.S.C. § 1333(a)(2)(A).

the subsoil and seabed of the [OCS]." (Id.). The platform was to be held stationary by a "wire mooring system" which "consists of cables/chains and suctions piles or caissons (anchors) embedded in the ocean floor." (Id.) It is undisputed that the platform is not a vessel. (Id., citing Fields v. Pool Offshore, Inc., (5th Cir. 1999)).

Numerous parties were engaged in the construction and installation process. SparTEC, one of the plaintiffs, was the general contractor for the project. (Rec. Doc. 85, Exhibit A, Dominion/SparTEC Agreement). SparTEC contracted with plaintiff JRME for "design and engineering services." (Rec. Doc. 85). JRME in turn subcontracted with defendant FMMG who was "to perform the engineering analysis and foundation analysis" of the platform. (Rec. Doc. 1). Pursuant to its contract with JRME, FMMG produced an engineering report discussing construction and installation of the platform. FMMG's report was essentially the blueprint for the process of constructing the caissons and installing them into the seabed. (Id.). FMMG played no part in actually installing the caissons; its only role was as designer and engineer. (Id.). Plaintiff JRM's role in this process involved "transportation and installation of the caissons using JRM's heavy lift crane vessels and other special purpose vessels." (Rec. Doc. 85). In other words, part of JRM's responsibility was to ship the materials out to the worksite for installation, in addition to helping with the installation itself. During the caisson installation process, certain caissons were damaged. JRM claims to have suffered damages from the delays and vessel down-time experienced as a result of the construction problems. (Rec. Doc. 1). It is alleged by the various plaintiffs that the cause of the damage was erroneous calculations made by FMMG in its engineering report. (Id.). The plaintiffs have asserted various causes of action in both tort and contract related to the alleged errors in FMMG's

3

report. FMMG is the lone defendant in this case. There are no allegations in this case that any other party caused the accident other than FMMG's boilerplate answer to the complaint wherein it alleges "want of due care on the part of plaintiffs in a number of respects." (Rec. Doc. 1).

II. Law and Analysis – Tort Claims

The ultimate question presented is which body of law, Louisiana law or federal maritime law, governs this dispute. The answer depends on the source of the Court's jurisdiction; that is, whether the case arises under OCSLA or the Court's admiralty jurisdiction. As is frequently the case with accidents occurring on or around platforms on the Outer Continental Shelf, the difficulty stems from fact that the facts giving rise to this dispute contain both maritime and non-maritime elements. The following three-part test is designed to structure the analysis. For OCSLA to apply:

> (1) The controversy must arise on a situs covered by OCSLA (i.e., the subsoil, seabed, or artificial structures permanently or temporarily attached thereto);
> (2) Federal maritime law must not apply of its own course; and,
> (3) The state law must not be inconsistent with federal law.[3]

Dupre v. Penrod Drilling Corp., 993 F.2d 474 (476) (5th Cir. 1993); Smith v. Penrod Drilling Corp., 960 F.2d 456, 459 (5th Cir. 1992).

---

[3] There is no argument before the Court that the pertinent Louisiana Law is inconsistent with federal law, so the Court will focus on only the issues of situs and the applicability of maritime law.

4

When an accident occurs on an OCSLA situs but also triggers the Court's admiralty jurisdiction, maritime law controls. See Smith, 960 F.2d at 459; Laredo Offshore Constructors, Inc. v. Hunt Oil Co., 754 F.2d 1223 (5th Cir. 1985).

This accident took place on a situs covered by OCSLA. OCSLA applies to "the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and *all installations and other devices permanently or temporarily attached to the seabed*, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom. . . ." 43 U.S.C. § 1333(a)(1)(emphasis added). Furthermore, the statute defines "development" as "those activities which take place following discovery of minerals in paying quantities, including geophysical activity, drilling, *platform construction*, and operation of all onshore support facilities, and which are for the purpose of ultimately producing the minerals discovered." 43 U.S.C. § 1331(l)(emphasis added). Damage that occurs to a platform during its construction on the Outer Continental Shelf is covered by the plain language of the statute. See, e.g., Laredo Offshore Constructors, Inc., 754 F.2d at 1229 ("We think it reasonably clear that a contract dispute . . . arising out of the allegedly improper partial construction of a fixed platform falls well within the range of legal controversies Congress expected and intended to be submitted under [OCSLA].") The situs requirement is clearly met in this case.

In order to determine whether maritime law applies of its own course, the Court applies the test laid out by the Supreme Court in Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527 (1995). Under Grubart, a party must satisfy each of

5

the so-called "location" and "connection"[4] tests. Grubart, 513 U.S. at 534; see also In re Madison Coal & Supply Co., Inc., 321 F.Supp.2d 809, 812 (S.D.W.Va. 2003)("Failure to establish either the location or the connection test is fatal to an assertion of admiralty jurisdiction."). To confer admiralty jurisdiction, it is not enough that the situs of the structure in this case is in navigable waters. The Fifth Circuit has made clear that in cases where OCSLA is involved, "admiralty jurisdiction and maritime law will only apply if the case has a sufficient maritime nexus wholly apart from the situs of the relevant structure in navigable waters." Laredo Offshore Constructors, Inc., 754 F.2d at 1230. This case lacks such an independent nexus. Although the facts of this case satisfy the location test, and the first part of the two-part connection test, the Court finds that the activity giving rise to the incident lacks "a substantial relationship to traditional maritime activity." Grubart, 513 U.S. at 540. OCSLA thus provides the only basis for this Court's jurisdiction and Louisiana law governs the dispute.

The location test, which emerges from the 1948 Extension of Admiralty Jurisdiction Act, asks "whether the tort occurred on navigable waters or whether the injury suffered on land was caused by a vessel on navigable water." Grubart, 513 U.S. at 534; see also 46 U.S.C. § 740. According to the Supreme Court, "Under the locality test, the tort 'occurs' where the alleged negligence took effect." Executive Jet Aviation, Inc. v. Cleveland, 409 U.S. 249, 266 (1972); see also Hails v. Atlantic Richfield Co., 595 F.Supp. 948, 950 (W.D.La. 1984) ("[A] tort occurs where the impact of the act or omission produces injury."). As the Supreme Court has acknowledged, it is often difficult to "locate" with precision where a particular tort occurred. See Executive Jet

---

[4] The "connection" test is often referred to as the "nexus" test. See, e.g., Complaint of Nolty Theriot, Inc., 841 F.Supp. 209 (S.D.Tex. 1994).

6

Aviation, Inc., 409 U.S. at 266 ("[T]he locality test . . . is sometimes almost impossible to apply with any degree of certainty."). This case is no different. Although it is admittedly a close call, the Court is persuaded that the location test is satisfied in this case.

JRM has alleged various types of damages. Of particular significance to this issue, it alleges "lost revenues to [its vessel] from idle days caused by caisson installation failure." (Fugro Ex. 3, Supplement to Rule 26(a)(1)(C) Disclosures, p. 2). Although JRM argues that FMMG's tortious activity – the negligent design of the platform – occurred "on land, far remote from any maritime situs," (Rec. Doc. 113), FMMG's actions undoubtedly negatively impacted JRM's ability to use its vessels on navigable waters. The law requires the Court to look beyond the inception of the tortious activity. Given the damages alleged by JRM, the Court finds the location test is satisfied.

The connection test flows from the Supreme Court admiralty jurisprudence culminating in its opinion in Sisson. The test has two parts. First, a court must "assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce." Grubart, 513 U.S. at 534 (quoting Sisson, 497 U.S. at 363-64)(internal citations and quotations omitted). Second, "a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." Id. (quoting Sisson, 497 U.S. at 364-65)(internal citations and quotations omitted). See Sisson, 497 U.S. at 362-67. In applying the two-part Sisson inquiry, courts must bear in mind that "protecting commercial shipping is at the heart of admiralty jurisdiction." Id. at 362. Although FMMG has satisfied the first part of the Sisson inquiry, it has failed to show a substantial relationship to traditional maritime activity.

7

The first <u>Sisson</u> inquiry requires this Court to "assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce." <u>Grubart</u>, 513 U.S. at 534 (quoting <u>Sisson</u>, 497 U.S. at 363-64)(internal citations and quotations omitted). <u>Sisson</u> requires that the Court first describe the incident "at an intermediate level of possible generality" in order to determine whether the "general features" of the incident were "likely to disrupt commercial activity." <u>Id.</u> at 538. In <u>Grubart</u> itself, for example, the Supreme Court considered whether it had admiralty jurisdiction over a case where flooding from the Chicago River had caused damage in the basements of buildings in downtown Chicago. The flood was allegedly caused by a "crane, sitting on a barge in the river next to a bridge" which was used to drive piles into the riverbed above a freight tunnel which later collapsed, causing water to flow through the tunnel into certain buildings. <u>Id.</u> at 529-30. In considering whether the incident had a potentially disruptive impact on maritime commerce, the Court first described the incident as "*damage by a vessel in navigable water to an underwater structure.*" <u>Id.</u> at 539 (emphasis added). It then described how the incident had disrupted maritime commerce, noting that "after the flood, the river remained closed for over a month, river traffic ceased, several commuter ferries were stranded and many barges could not enter the river system . . . because the river level was lowered to aid repair efforts." <u>Id.</u> (quoting district court findings as described in Petition for Certiorari).

In the instant case, the Court finds the general features of the incident at issue are best characterized as damage to a platform on the Outer Continental Shelf caused by allegedly defective engineering analysis and design. The Court need look no further than

to what actually happened in this case to determine the potential for such an accident to disrupt maritime commerce. Similar to the consequences of the flood described in Grubart, the accident in this case allegedly caused vessel down-time and delay. Such disruptions clearly satisfy the first Sisson inquiry.

Under the second Sisson inquiry, however, FMMG cannot establish that the facts of this case show a substantial relationship to maritime commerce. Here, the Court asks "whether a tortfeasor's activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand." Id. Because OCSLA and admiralty jurisdiction exist in some tension, it is necessary to examine the relationship between the two jurisdictional bases in order to determine whether the activity in this case can properly be characterized as related to maritime activity.

As explained by the Supreme Court in Rodrigue v. Aetna Casualty & Surety Co., "the purpose of [OCSLA] was to define a body of law applicable to the seabed, the subsoil, and the fixed structures . . . on the outer Continental Shelf." 395 U.S. 352, 355 (1969). After carefully scrutinizing the legislative purpose behind OCSLA, the Rodrigue Court found that Congress "had intended that the fixed platforms and similar installations erected for the development of resources be treated as though they were federal enclaves in an upland state." Laredo Offshore Constructors, Inc., 754 F.2d at 1230 (discussing Rodrigue). The Court noted that Congress "deliberately eschewed the application of admiralty principles to these novel structures [because] Congress considered maritime law ill-adapted to deal with legal disputes arising from the exploration and development of underground resources on the Outer Continental Shelf." Id. OCSLA therefore quite

9

self-consciously carved out select portions of the Court's admiralty jurisdiction where state law, not federal maritime law, would apply to disputes related to certain structures situated in the midst of navigable waters. See id. at 1232 ("[T]he OCSLA can only be regarded as a substantive restriction of the district court's admiralty jurisdiction, at least in regard to those cases in which admiralty jurisdiction would otherwise be predicated merely on the fact that the subject matter of the suit deals with the exploration and development of the [OCS] outside state territorial waters."). It is this analysis that prompted the Supreme Court's finding in Herb's Welding, Inc. v. Gray that "[t]here is nothing inherently maritime about" building and maintaining pipes and platforms on the Outer Continental Shelf. 470 U.S. 414, 425 (1985); see also AGIP Petroleum Co., Inc. v. Gulf Island Fabrication, Inc., 920 F.Supp. 1330, 1336 (S.D.Tex. 1996) (same). Therefore, by definition, those activities intended to fall within the ambit of OCSLA cannot also by their own force give rise to admiralty jurisdiction. Further, as the Fifth Circuit noted in Recar v. CNG Producing Co., "[T]he reach of OCSLA is broad." 853 F.2d 367, 369 (5th Cir. 1988).

With this in mind, it becomes clear that FMMG's actions – providing engineering analysis and design for the construction of a platform on the Outer Continental Shelf – are squarely within the scope of OCSLA and therefore unrelated to traditional maritime activity. The court considering substantially similar facts in AGIP Petroleum Co. came to the same conclusion with regard to the party analogous to FMMG in that case. 920 F.Supp. at 1338 ("[The defendants'] respective obligations were for the design and construction of the jacket for a fixed drilling platform. This activity is not considered a traditional maritime activity giving rise to admiralty jurisdiction.")  The only remaining

question is whether, as FMMG asserts, the use of vessels in transporting materials to the worksite gives rise to admiralty jurisdiction. As noted above, JRM used its vessels to transport the caissons to the construction site, and the downtime created by the inability to use these vessels for a period of time constitutes part of its alleged damages. There is no allegation that FMMG used vessels in any manner in performing its duties in this case.

In support of its argument, FMMG relies heavily on <u>AGIP Petroleum Co.</u> wherein the District Court applied federal maritime law instead of state law under OCSLA in a factually similar situation. Like JRM in this case, defendant McDermott's role in <u>AGIP Petroleum Co.</u> was "providing barges and tugs to transport and install the jacket offshore." <u>Id.</u> at 1339. The court found that McDermott's "involvement in connection with the platform was maritime in nature." <u>Id.</u> Citing <u>Grubart</u>, the court noted that "one tortfeasor's involvement in traditional maritime activity, which is alleged to be a proximate cause of the incident, is sufficient to invoke admiralty jurisdiction as to the other defendants." <u>Id.</u> The court accordingly found the nexus to traditional maritime activity satisfied as to each of the other defendants and applied maritime law. <u>Id.</u>

JRM contends that <u>AGIP Petroleum Co.</u> is distinguishable because McDermott, unlike JRM in this case, was a defendant and alleged tortfeasor. FMMG responds that this is a distinction that makes no substantive difference in that "the application of substantive law should not depend on the fortuity of whether JRM is a party plaintiff and alleged to be a tortfeasor, or a party defendant alleged to be a tortfeasor." (Rec. Doc. 135, p. 5).

The Court finds <u>AGIP Petroleum Co.</u> is distinguishable. At the outset, it bears noting that if the mere fact that a vessel was used by *some* party in *some* form in the

11

building of a platform in the middle of navigable waters were enough to remove a case from OCSLA's reach, the very purpose and significance of that statute would be gutted. For obvious reasons, vessels are oftentimes indispensable to construction that takes place on water. That said, <u>AGIP Petroleum Co.</u> and cases like it cannot be ignored. See, e.g., <u>Dupre v. Penrod Drilling Corp.</u>, 993 F.2d 474 (5th Cir. 1993) (finding that contracts focusing on the use of a vessel are considered maritime in nature). In this case, however, the record lacks even a single allegation that JRM's vessels had anything to do with this accident. The closest FMMG comes to making such a claim is in its answer wherein it alleges the "want of due care on the part of plaintiffs in a number of respects." (Rec. Doc. 1). This is a far cry from <u>AGIP Petroleum Co.</u> where McDermott was specifically named as a defendant. Although JRM's use of vessels may muddy the analytical waters to some degree, its relationship to the cause of the injury is not alleged to be substantial enough to remove a dispute from the reach of a statute that Congress clearly intended would control these types of accidents.

 Accordingly, the Court finds that FMMG ultimately fails to satisfy the <u>Grubart</u> requirements and maritime law thus does not apply here of its own course. Louisiana law therefore governs this dispute and the doctrine pronounced in <u>Robins Drydock & Repair Co.</u> is not applicable. There is no argument before the Court that JRM's tort claims are deficient under Louisiana law, so summary judgment is denied as to the those claims.

 III. Law and Analysis – Contract Claims

FMMG contends that JRM's contractual claims should be dismissed because JRM is not in contractual privity, either directly or as a third-party beneficiary, with FMMG. The Court agrees. It is undisputed that no contract existed between JRM and FMMG. Furthermore, JRM has failed as a matter of law to establish that it was intended to be a third-party beneficiary to the contract between FMMG and JRME.

Summary judgment is appropriately granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is not a genuine issue for trial." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] ... which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the burden shifts to the non-movant to come forward with "specific facts" that establish an issue for trial. Id. "[M]ere allegations or denials" will not defeat a well-supported motion for summary judgment. Fed.R.Civ.P. 56(e). When deciding a motion for summary judgment the Court must avoid a "trial on affidavits."

Anderson, 477 U.S. at 255. It is the role of the factfinder, not the court at the summary judgment stage, to weigh the evidence and make credibility determinations. Id. In deciding the motion for summary judgment, "all evidence must be construed in the light most favorable to the party opposing summary judgment." Matsushita Electric Industrial Corp., 475 U.S. at 600-601.

In light of the above findings, the Court applies Louisiana law to this claim. In order to qualify as a third-party beneficiary under Louisiana law, JRM must establish that the FMMG/JRME Work Order clearly reveals the intent to provide a benefit to a third party. Wallace v. Texaco, Inc., 681 F.2d 1088 (5th Cir. 1982) (citing Gateway Barge Line, Inc. v. R.B. Tyler Co., 175 So.2d 867 (La.App. 1st Cir. 1965)); see also Burdis v. Lafourche Parish Police Jury, 542 So.2d 117 (La.App. 1st Cir. 1989). The fact that a third party benefits from a contract is not sufficient to establish third-party beneficiary status, Id., and such status is never presumed. Smith v. State Farm Insurance Co., 869 So.2d 909, 912-13 (La.App. 4th Cir. 2004). The benefit must be part of the condition or consideration of the contract and not simply incidental. Burdis, 542 So.2d at 118.

JRM has not pointed to any evidence that FMMG and JRME intended to confer third-party beneficiary status to JRM. The only even arguable reference to JRM in the work order itself is that JRM is listed as the party to whom FMMG should send its invoices.[5] The simple fact that JRM may receive invoices for whatever reason is insufficient as a matter of law to evince a *clear intent* by FMMG and JRME to confer third-party beneficiary status to JRM. Additionally, the fact that FMMG was aware of

---

[5] FMMG in its reply asserts a compelling argument that the reference to JRM in the work order is simply a mistake. For purposes of this motion, however, the Court takes the facts in the light most favorable to JRM and assumes JRM was intentionally referenced.

JRM's presence in the project is of no moment. Mere awareness of another party's involvement similarly falls short of intent to create third-party rights to the contract.

Accordingly, summary judgment is **GRANTED** with regard to JRM's contract claims and those claims are hereby **DISMISSED**.

New Orleans, Louisiana, this 29 day of March, 2006.

HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE